**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: Andrew R. Hayward, | : | Chapter 13 |
| Debtor. | : | Bky. No. 22-11806 (PMM) |
| | : | |
| Tyler P. Heckard and Katrina T. Ambron, Plaintiffs. | : | |
| v. | : | Adv. No. 23-0009 (PMM) |
| Andrew R. Hayward, | : | |
| Defendant. | : | |

# O P I N I O N

## I. INTRODUCTION

Katrina Ambron ("Ms. Ambron") and her former husband Tyler Heckard ("Mr. Heckard")[1] employed Andrew Hayward, the Debtor/Defendant, to perform two (2) construction projects on their home. The Plaintiffs paid the Debtor a total deposit of more than $40,000.00 for the projects. The work was started but not completed; the deposit was not refunded. On that much the parties agree. They also agree that at least $23,455.50 is owed by the Debtor to the Plaintiffs. See Objection to Proof of Claim no. 5 (the "Proof of Claim").

Ms. Ambron—pursuing this cause of action in the absence of Mr. Heckard—contends that the amount owed to her by the Debtor should not be discharged in this chapter 13 bankruptcy because the Debtor acted fraudulently in obtaining the contracts. The Debtor counters that while

---

[1] Although both Ms. Ambron and Mr. Heckard remain on the caption of the Complaint, this matter was prosecuted by Ms. Ambron alone. Therefore, Ms. Ambron will at times be referred to as the "Plaintiff" and the couple jointly will be referred to as the "Plaintiffs."

1

the work did not go according to plan, the problems arose due to poor planning or bad luck, rather than as a result of an intentional misrepresentation.

A trial, at which Ms. Ambron and Mr. Hayward testified, was held on October 30, 2023. For the reasons that follow, I find that while Ms. Ambron showed that the Debtor did not perform as agreed, she failed to provide evidence of his intent to do so. Moreover, based on the evidence presented, I find that the value of Debtor's work and materials/costs associated with the project to be worth at least $16,600.00. Therefore, judgment will be entered for the Debtor and the Objection to the Proof of Claim granted.

## II. PROCEDURAL BACKGROUND

The Debtor, who is the sole proprietor of Iron Edge Contracting, filed for chapter 7 bankruptcy protection on July 28, 2022. The Debtor converted his case to chapter 13 on September 22, 2022. On December 1, 2022, the Plaintiffs filed the Proof of Claim number 5—an unsecured claim in the amount of $40,055.50. The basis of the claim is "advance paid to Debtor for construction work not completed."[2] Proof of Claim at 2. The Debtor objected to the Proof of Claim, asking that a portion—$16,600.00—be disallowed.

This Adversary proceeding was filed by the Plaintiffs a few months after the Proof of Claim and seeks denial of discharge pursuant to 11 U.S.C. §523(a)(2)(A) with regard to the Plaintiffs' down payment (40,055.50).[3]

---

[2] The Proof of Claim did not state damages for remediation.

[3] The chapter 13 trustee was removed as a Defendant on February 10, 2023. Doc. #4.

2

The Adversary Proceeding and the Proof of Claim were consolidated for trial, which was held and concluded on October 30, 2023. Doc. #23. Two witnesses testified at the trial: Katrina Ambron and Andrew Hayward.[4]

### III.  FINDINGS OF FACT

Based on the credibility of the witnesses and the plausibility of their testimony, and upon review of the relevant evidence and case docket, I make the following findings of fact.

### Background

1. The Plaintiffs, Tyler Heckard and Katrina Ambron, were married at the time the Complaint was filed but are currently separated. Transcript of October 30, 2023 trial (doc. #30, the "Tr.") at 5.

2. Katrina Ambron and her 74 year-old mother currently own the property located at 301 North Lancaster Ave. in Schaefferstown, PA (the "Property"). Tr. at 4-5.

3. Ms. Ambron lives at the Property with her mother, Mr. Heckard's mother, and her infant son. Tr. at 5.

4. Ms. Ambron contacted the Debtor in late 2019 or early 2020 regarding renovation of the Property. Tr. at 36.

5. The Debtor has been a licensed, independent contractor since 2010; he has been the sole proprietor of his business, Iron Edge, since 2020. Tr. at 37; Ex. P-7 at 5.

### The Contracts

6. On December 14, 2020, the parties entered into a contract in which Debtor would convert a second floor bedroom and bathroom into a nursery for the sum of $44,855.00 (the "First Contract"). Ex. D-1; Tr. at 48.

---

[4] Although scheduled to appear, see Joint Pretrial Statement at 5, Plaintiff Tyler Heckard and expert Ralph Mase did not testify.

3

7. At the formation of the First Contact, the Plaintiffs paid Defendant $22,427.50. Complaint at ¶13; Ex. P-4.

8. On March 19, 2021, the Plaintiffs contracted (the "Second Contract") for the Defendant to build a sunroom addition for Ms. Ambron's mother on the back of the Property. Complaint at ¶7; see Joint Pretrial Statement ("JPS"), doc. #20, at 2-3; Ex. D-1; Tr. at 6.

9. The agreed amount of the Second Contract was $27,120.00, of which the Plaintiffs paid $17,628.00. Complaint at ¶10-11; Tr. at 6-7; Ex. P-2.

10. Ms. Ambron changed her mind regarding which renovation (the upstairs or the sunroom) she preferred that the Debtor begin with; originally Ms. Ambron wanted the upstairs nursery completed first because she was pregnant. However, when Ms. Ambron lost that pregnancy, she decided that work on the sunroom (as a space for her mother to use) should be performed first. Tr. at 7-8.

11. The estimate was that work on the Second Contract would begin in August 2021 and be completed in September 2021. Ex. D-3.

12. The Plaintiffs paid the Defendant for work on the two (2) contracts a total deposit amount of $40,055.50 ($17,628.00 plus $22,427.50, collectively the "Deposit") as a down payment. JPS at 2-3; Tr. at 9.

### Work Performed and not Performed

13. The Debtor did no work on the upstairs of the Property; he only entered that space once to estimate the cost of work. Tr. at 11, 66.

14. The Debtor did not purchase the materials needed for work on the second floor. Tr. at 67.

15. However, a township zoning permit was obtained by the Debtor for work to be performed on the sunroom (on the first floor). Tr. at 23, 27, 46; Ex. D-3. The permit was issued in July of 2021. Tr. at 47.

16. In preparation for work on the sunroom, the Debtor took field dimensions, and produced design drawings. Tr. at 41-45; Ex. D-4.

17. The Debtor rented a backhoe, paid for concrete to be poured, and purchased materials in advance of doing work on the Property. Tr. at 56-59, 61; Ex. D-6.

18. The Debtor began work on the sunroom project in September 2021. Tr. at 12, 70, 76; Ex. D-8.

19. The Defendant worked on the sunroom for about 200 hours; he excavated the construction site, poured concrete, framed a substantial portion of the sunroom, updated the plumbing, and trimmed trees in preparation for further work. Tr. at 26, 28-29, 74, 79; Ex. D-8.

20. The value of the materials purchased for work on the Property is between $5,000.00, see Tr. at 69-70, and $20,000.00, see Ex. P-7 at 18.[5]

21. The Debtor paid subcontractors for their work on the project. Tr. at 75-76, 78; Ex. D-5.[6]

22. The Debtor's work was stalled by many factors, including personal injury and the sickness of an employee. Tr. at 71-72.

23. The Covid-19 pandemic made materials and labor more expensive (although the contracts were entered after the pandemic began). Tr. at 48-51, 65.

---

[5] The Objection to the Proof of Claim states that labor and materials were worth "a minimum of $16,600." See Bankr. Case No. 22-11806, doc. #76.

[6] The amount paid to subcontractors specifically for work performed on the Property is unclear. Tr. at 78.

24. Although the Defendant worked on the sunroom, he left that part of the Property in disrepair, with the gutters, siding, and roof removed but not replaced.  Tr. at 14-15, 16; Ex. P-5.[7]

25. The disrepair on the Property's first floor included nails sticking out of a metal gutter and a jumble of stones and concrete.  Tr. at 16.

26. The Plaintiffs purchased and installed a plastic tarp in order to minimize the flow of water caused by the absence of a roof.  Tr. at 17-18.

27. Mr. Heckard removed some of the Property's wood framing in an effort to remediate the alleged damage to the Property.  Tr. at 16.

28. The Debtor stopped work on the Property in May 2022.  Tr. at 72-73.

29. Following the work performed by the Debtor, he left the following materials on the Property: a well, ladder, tarp, pieces of wood.  Tr. at 20.

30. While the Debtor did not complete the work, JPS at 3, he intended to do so.  Tr. at 64-65; Ex. P-7 at 19.[8]

## Communication between the Parties

31. Mr. Hayward represented that the Deposit would be used to pay for materials for work on the Property and failed to tell the Plaintiffs that these funds would be used to pay for materials for other projects.  Tr. at 9-10, 67-68.

32. The Debtor intended the deposit money to fund the contracted projects.  Tr. at 62.

---

[7] In making this finding, I have considered the fact that the Debtor credibly testified that Plaintiffs' photographic evidence is not a contemporaneous account of the condition in which he left the Property, Tr. at 27, and that certain materials were installed in new condition, rather than in the weathered state in which they appear in the photos.  Tr. at 52-55.  However, upon review of the photographic evidence, combined with the Debtor's credible and detailed description of the poor condition of her home, I find it more likely than not that the incomplete state of the work on the Property meant that the Ms. Ambron's home remained in a state of neglect.

[8] As discussed in more detail below, I find the Debtor's assertion that he wanted to finish the project rather than to abandon it to be credible.

33. In or around December 2021 Ms. Ambron asked the Debtor for a refund of her Deposit. Tr. at 21; 73. The Debtor stated that he could not provide a refund because he had purchased materials and begun work. Tr. at 73; Ex. D-8.

34. Because the Defendant was not working on the upstairs project, on or around June 15, 2022, Ms. Ambron asked him to return the deposit for that portion of the project. The Debtor responded that that money had been spent on materials. Tr. at 11, 20; Ex. D-1.

35. Ms. Ambron and the Debtor's wife, Heather, also communicated by text; Heather attempted to forestall Ms. Ambron's fears and assure her that the job would be completed. Tr. at 33; Ex. D-7.

36. Once Ms. Ambron understood the extent of disrepair of her Property, she decided to sue the Debtor. Tr. at 19. At this point, the Defendant and his wife contacted Ms. Ambron to try to persuade her to let the Debtor finish the work. Tr. at 19.

37. On June 15, 2022, Ms. Ambron texted the Defendant alerting him that she did not want him to perform any additional work on her property. Tr. at 30, 63-64.[9]

## IV. DISCUSSION

### A. 11 U.S.C. §523(a)(2)(A)

Because bankruptcy is designed to allow debtors a reprieve from the weight of personal debt, exceptions to discharge are "strictly construed against creditors and liberally construed in favor of debtors." In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995).

The Plaintiffs seek denial of discharge pursuant to §523(a)(2)(A), which states that an individual will not be discharged a debt

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . .

---

[9] A copy of this text does not appear to be contained in the exhibits.

To except a debt from discharge under §523(a)(2)(A), the false representations giving rise to the debt must have been knowingly and fraudulently made. 4 Collier on Bankruptcy P 523.08 (16th 2023).  A "false representation" involves a misleading affirmative statement, In re Ricker, 475 B.R. 445, 456 (Bankr. E.D. Pa. 2012) (citing In re Giquinto, 388 B.R. 152, 165 n.26 (Bankr. E.D. Pa. 2008), whereas a "false pretense" is conduct that "fosters a false impression." Giquinto, 388 B.R. at 174.  Each element of §523(a)(2)(A) requires a showing of fraudulent intent to deceive at the time the debt arose.  In re Oakley, 503 B.R. 407, 432 (Bankr. E.D. Pa. 2013), aff'd, 530 B.R. 251 (E.D. Pa. 2015) (can offer circumstantial evidence); In re Anandani, 578 B.R. 523, 528-29 (Bankr. E.D. Pa. 2017); Giquinto, 388 B.R. at 165.

To make out a prima facie case of false representation under §523(a)(2)(A), the plaintiff must demonstrate that: (1) the debtor made a false representation; (2) which at the time of the representation, the debtor knew, or believed, was false; (3) the false representation was made with the intent and purpose of deceiving the creditor; (4) the creditor justifiably relied upon the representation; and (5) the creditor sustained damages as a proximate result of the misrepresentation.  In re Didio, 607 B.R. 804, 816 (Bankr. E.D. Pa. 2019).  The Plaintiff must prove each element by a preponderance of the evidence.

### B.  Analysis

There is no real factual dispute in this matter.  The testimony and exhibits bear out that the Debtor performed some, but not all, of the work that he was hired to perform.  Work on the Property was delayed by a host of factors (Covid, illness, problems securing materials and labor, the weather, a dead horse), and was not completed.  The work the Debtor did complete, even according to his own lawyer, was substandard.  Tr. at 82-83.

That the work performed was negligent and may have done more harm than good to the Property certainly matter a great deal to Ms. Ambron and her family. But these facts are not directly relevant to the relief sought in this lawsuit. The Debtor is not alleged to have absconded with the Deposit, an action which might evidence his fraudulent intent to secure payment and not perform. Rather, the Debtor worked on the project and did a bad job. This may well be negligence, but it does not on its own amount to fraud. See e.g., In re Barr, 194 B.R. 1009, 1017 (Bankr. N.D. Ill. 1996) (performing subpar work as a contractor is not evidence of fraudulent misrepresentation); In re Roggasch, 494 B.R. 398, 407 (Bankr. E.D. Ark. 2013) (evidence of negligence or shoddy workmanship does not establish false representation with intent to deceive).

Further, the fact that the Debtor spent some 200 hours on the project, hired subcontractors, made design drawings, excavated, poured concrete, framed the siding, updated the plumbing, and trimmed trees, belies the notion that the Debtor entered the contract with the intent of not completing it. See Findings of Fact at 19-21. Proving such intent is a necessary element of showing that a contractor is a fraud. Giquinto, 388 B.R. at 166; In re Rahrig, 373 B.R. 829, 834 (Bankr. N.D. Ohio 2007) ("the greater the extent of a debtor's performance, the less likely it will be that they possessed an intent to defraud.").

Rather, a review of the many text exchanges between the Plaintiff and the Debtor over the course of nearly a year reveals that while the Debtor was unorganized, sloppy, and at times uncommunicative, but he did not try to get out of doing the work. Ex. D-8; Tr. at 54. In fact, just before he was fired by Ms. Ambron in June 2022, the Debtor asked for a "new schedule to get these two projects wrapped up . . . ." Ex. D-8 at 1. His execution left much to be desired; but there is no evidence that the Debtor's intent was fraudulent.

The Plaintiff's response—in fact her only argument—is that the Debtor made a false representation when he told the Plaintiffs that the Deposit would be used to purchase only their materials, as opposed to being used to purchase materials for other jobs. Tr. at 81 ("[h]e intended to induce them to pay him so that he could have money to pay for his other projects."). In other words, Ms. Ambron contends that the contracts were procured by the Debtor's fraudulent representation that he would earmark the Deposit and use it only to pay for materials for work on the Property.

Even if we assume that the Debtor's promise to segregate and earmark the Deposit was a statement that the Debtor knew to be false when he made it, the argument that such a lie is dispositive is flawed for at least two (2) reasons.

First and foremost, there is no indication that the Debtor's statement about the Deposit accounting indicates or reveals an intent to deceive. Rather, the Debtor credibly testified that the industry practice is for small contractors to create a "pipeline of funds," whereby a customer's initial deposit creates a "scheduling hold," but is not placed into a separate account. Tr. at 62. The contractor uses deposits as an aggregate to pay for current materials at the best price; the account is then to be replenished by future deposits. Tr. 62-63. Here, the Debtor's intent to put funds towards the Plaintiff's project is evidenced by the fact that he paid subcontractors and purchased materials to get things started. Tr. 21, 26-7. A contractor's practice of juggling money when funds are not plentiful does not on its own indicate a fraudulent intent. As one court stated:

> The Plaintiffs also argue that [the Debtor's] conduct must be viewed as fraudulent because he was using business receipts obtained on one project, including the Plaintiffs', to pay for other projects. In the words of Plaintiffs' counsel: [the Debtor] was "robbing Peter to pay Paul." While not denying this practice, [the Debtor] responded that this was done out of necessity because at the time his business was facing financial hardships.
> **It is not an uncommon occurrence for many businesses, as they begin their slide into insolvency, to use funds received from one project to pay for another.** Obviously, such

10

a practice cannot be condoned. **Yet, alone, such a practice does not establish that a debtor acted with the intent to defraud** . . . .

In re Mills, 345 B.R. 598, 606 (Bankr. N.D. Ohio 2006) (dismissing nondischargeability cause of action) (emphasis added).

Second, the Plaintiff fails to provide evidence showing that she relied on the Debtor's representation regarding the Deposit. To the contrary, the testimony at trial showed that Ms. Ambron was eager to have the Debtor complete the two (2) projects on her house and trusted him with the family's "hard-earned money." Tr. at 20.

For all these reasons, I find it more likely than not that the Debtor did not intend to defraud the Plaintiffs. The debt owed by the Debtor to the Plaintiffs may, therefore, be discharged.

### C. Amount of Debt Allowed

This Adversary seeks denial of discharge of the debt owed by the Debtor to the Plaintiffs. The amount of that debt is informed by the Plaintiffs' Proof of Claim, determination of which was consolidated with the disposition of the Adversary. See doc. #23. Because the Debtor only objects to $16,600.00 of the $40,055.50 stated in the Proof of Claim, he acknowledges that he owes $23,455.50 as an unsecured debt. 11 U.S.C. §502(a); Fed. R. Bankr.P. 3001(f). Based on the evidence of the work completed by Debtor as well as the receipts submitted for materials and costs, I find it reasonable to value the debtor's work on the project at $16,600.00. Accordingly, the claim will be reduced by this sum and allowed as an unsecured general claim in the amount of $23,455.50. This amount will be paid according to the terms of the confirmed Plan and may be discharged at the conclusion of this chapter 13 bankruptcy.

11

## V.  CONCLUSION

The Debtor contracted to renovate the Plaintiff's home but left the Property in worse shape than he found it.  He spent time on the project but was unorganized and unprofessional.  As a result, the Plaintiff's goal of making her home more comfortable and valuable was thwarted.

However, in pursuing her cause of action for denial of discharge based on a fraudulent representation, Ms. Ambron failed to provide the necessary evidence of the Debtor's intent to deceive.  Thus, in assessing "the Debtor's credibility against the weight of the evidence offered against him" and by applying the law and also "relying . . . on experience and human intuition," I determine that judgment should be entered in favor of the Defendant.  Ricker, 475 B.R. at 458.

**Date:**   March 1, 2024

_____
**PATRICIA M. MAYER**
**U.S. BANKRUPTCY JUDGE**